# EXHIBIT 11

**MEMORANDUM**

DEPARTMENT OF HEALTH AND HUMAN SERVICES
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION
CENTER FOR DRUG EVALUATION AND RESEARCH

DATE: September 28, 2000

FROM: _____ /S/    SEP 28 2000

SUBJECT: _____ Memo

TO: NDA 20-687 MIFEPREX (mifepristone) Population Council

This memo documents the approval action concerning the Population Council's NDA for mifepristone for the medical termination of intrauterine pregnancy through 49 days' pregnancy. The application was initially submitted to the Food and Drug Administration (FDA) on March 14, 1996. The Reproductive Health Drugs Advisory Committee met on July 19, 1996 and voted that benefits exceeded risk for this drug product with 6-yes, 0-no, and 2 abstentions. An approvable action letter was issued September 18, 1996 citing deficiencies in areas of Clinical (distribution system), Chemistry/Manufacturing and Controls, Biopharmaceutics, and Labeling. A complete response was received August 18, 1999. The last action by the Office was on February 18, 2000. That approvable action letter listed application deficiencies consisting of Chemistry/Manufacturing and Controls, Labeling, and the Distribution System issues. The Population Council submitted a complete response on March 30, 2000. After a brief summary of effectiveness and safety, this memo addresses those outstanding issues listed in the last action letter, Phase 4 commitments, and other issues.

Summary of Effectiveness and Safety

Effectiveness and safety data were derived from one U.S. clinical trial and two French trials. Effectiveness was defined as the complete expulsion of products of conception without the need for surgical intervention.

The U.S. trial consisted of 859 women providing safety data and 827 women providing effectiveness data for gestations of 49 days or less, dated from the last menstrual period. Demographic data showed racial composition of the U.S. trial was similar to the overall U.S. general population. Medical abortion was complete in 92.1% of 827 subjects. Surgical intervention was performed in 7.9% of subjects: 1.6% had medically indicated interventions (1.2% for heavy bleeding), 4.7% had incomplete abortions, 1.0% had ongoing pregnancies, and 0.6% had intervention at the patient's request. One of the 859 patients received a blood transfusion.

The two French trials enrolled a total of 1,681 women providing effectiveness outcomes and 1,800 women providing safety information. Medical abortion was complete in 95.5% of the 1681 subjects. Surgical intervention was performed in 4.5% of subjects: 0.3% for bleeding, 2.9% for incomplete abortions, and 1.3% for ongoing pregnancies. Of the 1,800 women, 2 patients received blood transfusions.

The Advisory Committee reviewed the French data in 1996 and voted 6-yes and 2-no for data supporting efficacy, 7-yes and 1-abstention for data supporting safety. As stated above, the overall vote for benefits exceeding risk was 6-yes, 0-no, and 2-abstentions. During the second review cycle in 1999, the committee received a copy of the U.S. study report, as they requested, to provide FDA with comments. None were received. The U.S. trial data confirms the effectiveness and safety of the product.

APPEARS THIS WAY
ON ORIGINAL

1

MIF 001745                                                                                                                    FDA 0223

### Chemistry/Manufacturing

In May, 2000 the Population Council informed the Division of Reproductive and Urologic Drug Products that the bulk drug substance maker had changed manufacturing processes last summer. New analytic, physical, and stability data were received and reviewed and found to be adequate to ensure the quality of the drug manufacturing was preserved.

An inspection of the bulk drug substance maker was performed on July 24-28, 2000. Deficiencies were cited and the manufacturer corrected these. These corrections were found acceptable.

Because the drug is being distributed directly to qualified physicians, there is minimal chance for drug name confusion and I agree with the name, Mifeprex.

### Labeling

Labeling is important to educate prescribers and patients about the safe and effective use of the drug and to inform health professionals about adverse event risks. The 1996 Advisory Committee strongly supported education of users of mifepristone. By coupling professional labeling with other educational interventions such as the Medication Guide, Patient Agreement, and Prescriber's Agreement, along with having physician qualification requirements of abilities to date pregnancies accurately and diagnose ectopic pregancies (and other requirements), goals of safe and appropriate use may be achieved. The drug's labeling is now part of a total risk management program that will be summarized below. The professional labeling, Medication Guide, Patient Agreement, and Prescriber's Agreement will together constitute the approved product labeling to ensure any future generic drug manufacturers will have the same risk management program.

The labeling for mifepristone has been revised to provide information about how to report adverse events. FDA and the Population Council agree that a black box will highlight special items related to the drug. In addition, FDA has determined that a Medication Guide for this drug will help ensure dispensers provide important information to patients to enhance compliance with the regimen for safety and efficacy. Furthermore, a patient agreement fosters active patient education and participation in this regimen. The Population Council will provide these educational materials (the professional labeling, the Medication Guide, the patient agreement form, and the Prescriber's Agreement form). The professional labeling, Medication Guide, Patient Agreement, and Prescriber's Agreement must be read, understood, and attested to by physicians who meet prescribing qualifications (discussed below).

#### Black Box

21 CFR 201.57(e) permits FDA to require a black box warning for special problems, particularly those that may lead to death or serious injury. The Population Council agreed in its July 5, 2000 submission to a black box warning. It was agreed that the box would contain the following:

> "If Mifeprex results in incomplete abortion, surgical intervention may be necessary. Prescribers should determine in advance whether they will provide such care themselves or through other providers. Prescribers should also give patients clear instructions of whom to call and what to do in the event of an emergency following administration of Mifeprex.
>
> Prescribers should make sure the patients receive and have an opportunity to discuss the Medication Guide and Patient Agreement."

#### Misoprostol Administration

The approvable letter issued by FDA on 2/18/2000 agreed to the Population Council's statement that women could have the option of taking misoprostol on Day 3 either at home or at the prescriber's office. However, data provided by the Population Council supporting home use was re-reviewed and found not to provide substantial evidence for safety and efficacy. The data were anecdotal off-label experience with

2

a vaginal misoprostol regimen, an observational study about home use in Guadeloupe, and a U.S. clinical study of home use of a different regimen with different drug doses. The only study that commented on whether home use led to correct use was the Guadeloupe study reporting that 4% of patients who took misoprostol at home did it incorrectly. Returning to the health care provider on Day 3 for misoprostol, as in the U.S. clinical trial, assures that the misoprostol is correctly administered. This requirement has the additional advantage of contact between the patient and health care provider to provide ongoing care and to reinforce the need to return on Day 14 to confirm that expulsion has occurred.

Early in drug development, a mandatory observation period of 3-4 hours was instituted in clinical trials worldwide when a prostaglandin analogue, sulprostone, was used with mifepristone and felt to have some cardiovascular risk. This drug is no longer being used with mifepristone and is not a marketed drug in the U.S.; therefore, the rationale for an observation period is moot. There is no more likelihood of an adverse event occurring in the few hours after misoprostol administration than during the entire study period.

Therefore, as a consequence of this re-evaluation, the labeling currently reads that the patient returns on Day 3 for misoprostol and is given instructions about adverse events and whom to contact for questions and emergencies.

### Access to Health Care and Emergency Services

FDA agreed with the Population Council that access to health care and emergency services is critical for the safe and effective use of the drug. The clinical trials ensured access to services. The labeling has a black box highlighting the possible need for surgical intervention and either the provision of access to these services by the prescriber or through referral. The labeling has a contraindication if there is no access to medical facilities for emergency services. The Patient Agreement emphasizes the need to know what to do in the case of an emergency.

### Patient Agreement Form

Patients should be informed about the indication of the drug and how it is given. They must understand the type of regimen they are about to commit to and its risks and benefits. The signed agreement form will be given to the patient for her reference and another kept in the medical record. The Population Council has committed to auditing prescribers to ascertain whether they have obtained signed copies of the Patient Agreement forms.

### Biopharmaceutics

This review cycle, the clinical biopharmaceutical reviewers evaluated new data in the published literature regarding the metabolism of mifepristone by the P450 3A4 system. Mifepristone is a substrate and this may inhibit drug metabolism of certain drugs and induce metabolism of others. This information was placed in the professional labeling and patients are instructed in the Medication Guide that use of other drugs may interfere with actions of mifepristone and misoprostol.

### Pharmacology-Toxicology

Current literature on the effects of human fetal exposure to mifepristone and misoprostol or mifepristone alone was reviewed to ensure risk information was current. Many of the case reports of malformation concern the unsuccessful use of misoprostol for abortion, resulting in limb, facial, cranial, and other abnormalities. Many reports were retrospective in nature, subject to reporting and recall bias. Nevertheless, the risk of malformation is very important to address. This drug's indication is for pregnancy termination. The labeling, Medication Guide, process of obtaining patient agreement on medical abortion, and the commitment of the physicians through their signed Prescriber's Agreement are all meant to ensure women are completely informed about the process and make a commitment to follow through.

APPEARS THIS WAY
ON ORIGINAL

3

The labeling for Mifeprex states that it is used with misoprostol for termination of pregnancy of 49 days or less. Human data on mifepristone and misoprostol used in this timeframe is available. Safety Update Report #3 submitted on March 31, 2000 contains Exelgyn Laboratories Periodic Safety Update Report #9 for the period of September 1, 1998 to November 30, 1999. It lists 38 on-going pregnancies with mifepristone plus misoprostol. The Lancet published a letter in July 1998 from Exelgyn in which they mention that they had reviewed 71 cases of continuing pregnancies after failed early termination of pregnancy occurring from 1987 to 1998 and found no reported cases of malformation associated with use of mifepristone and misoprostol. There was one report of sirenomelia and cleft palate in a patient who had a therapeutic termination at week 7 gestation associated with mifepristone use alone. On July 6, 1999 the European Summary of Product Characteristics contains a statement for mifepristone that in humans, the reported cases do not allow a causality assessment for mifepristone alone or used with a prostaglandin. On August 21, 2000 the sponsor provided Exelgyn's 12/1/99 to 5/31/00 Periodic Safety Update on pregnancy outcomes following early pregnancy exposure. The current labeling has these new data on 82 pregnancies exposed to mifepristone only (40) and mifepristone used with misoprostol (42). FDA agrees that no conclusion can be made from the data at this time. Information on the possibility of a risk of malformation, including the above information as well as the anecdotal reports, is nevertheless included in the professional labeling, Medication Guide, and Patient Agreement. The Population Council has committed to continuing ongoing surveillance of human malformation risk.

### Medication Guide

This product will be approved with a Medication Guide which dispensers must provide with the drug. It is important for patients to be fully informed about the drug, as well as the need for follow up, especially on Day 14 to confirm expulsion. A Medication Guide was determined to be necessary to patients' safe and effective use of the drug. The drug product is important to the health of women and the Medication Guide will encourage patient adherence to directions for use. Patient adherence to directions for use and visits is critical to the drug's effectiveness and safety.

### Distribution System

Since 1996, FDA and the Population Council have agreed, as publicly discussed with the Reproductive Drug Products Advisory Committee, that once approved, the drug will be distributed directly to physicians. It will not be available from pharmacies. There were also discussions about the qualifications of the physicians receiving mifepristone for dispensing. The Committee also stated it was important that women have access to medical abortion as this new therapeutic option may offer women avoidance of a surgical procedure.

In January 2000, the Population Council provided its initial plan for drug distribution. This plan was resubmitted in its complete response of March 30, 2000. This plan had acceptably addressed the issue of physical security of the drug. The distribution system plan stated specific requirements imposed on and by distributors of the drug, including procedures for storage, dosage tracking, damaged product returns, and other matters. See Subpart H of this memo for more details. Other aspects of the distribution system are addressed below.

### Physician Qualifications

Physician qualifications were discussed within CDER, the Agency, and with the Population Council. FDA also discussed physician qualifications with a special government employee with expertise in early pregnancy. The Population Council proposed that the drug be directly distributed to qualified physicians, as opposed to other types of health care professionals (midwives, physician's assistants, nurse practitioners, etc.). This restriction was supported by the discussions of the 1996 Advisory Committee. In fact, the clinical trial data was derived from the experience of physicians using this drug. Thus, physicians remain the initial population who will receive this drug for dispensing. This does not preclude another type of health care provider, acting under the supervision of a qualified physician, from

APPEARS THIS WAY
ON ORIGINAL

dispensing the drug to patients, provided state laws permit this. Should data be provided to amend the restriction to physicians, FDA will consider them.

The types of skills physicians had in the U.S. clinical trial were: 1) the ability to use ultrasound and clinical examination to date pregnancies and diagnose ectopic pregnancies, 2) the ability to perform surgical procedures, including dilation and curettage, vacuum suction, and/or surgical abortions, for bleeding or incomplete abortion, and, 3) they had privileges at medical facilities to provide emergency resuscitation, transfusion, hospitalization, etc. Physicians were trained to use the drug per protocol. Fourteen of the seventeen physicians in the U.S. clinical trial were obstetricians/gynecologists. All patients were within one hour of emergency facilities or the facilities of the principle investigator.

The role of ultrasound was carefully considered. In the clinical trial, ultrasound was performed to ensure proper data collection on gestational age. In practice, dating pregnancies occurs through using other clinical methods, as well as through using ultrasound. Ultrasound information can be provided to the prescribing physicians to guide treatment, but this information can be obtained through consultation referral from an ultrasound provider and does not necessarily need to be obtained by the prescriber him/herself. The labeling recommends ultrasound evaluation as needed, leaving it to the medical judgement of the physician.

The Population Council proposed that any physician who could date pregnancies and diagnose ectopic pregnancies should be able to receive the drug from the distributor. These two qualifications alone limit the number of physicians who will be eligible to receive mifepristone from the Population Council's distributor(s) to those physicians who are very familiar with managing early pregnancies. These two qualifications also are performance-based standards and do not limit providers of mifepristone to specific medical subspecialties. Education about the use of the drug is described above in the Labeling section of this memo. Because qualified physicians will be using this drug, there is no need for special certification programs. The current labeling and distribution system states physician need not have skills for handling surgical interventions, but could provide referral to services for incomplete abortion and emergency care. The Population Council stated that current medical practice is structured on referral of patients who need surgery (for example, women with a spontaneous incomplete abortion or a cardiologist's patient who needs by-pass grafts) to a physician possessing the skills to address the problem. Moreover, within the U.S. clinical trial, 11 patients out of roughly 850 patients needed surgical intervention to handle bleeding, the most important urgent adverse event associated with this drug, and 3 of these patients were handled by non-principal investigators such as the emergency room and non-study gynecologist. This suggests that patients will get the needed surgical intervention by either their physician or another physician with the needed skills. Referral to a hospital for emergency services does not mean having admitting privileges, but having the ability and the responsibility to direct patients to hospitals, if needed. The professional labeling and the Medication Guide highlight that surgery may be needed and patients need to know if the provider of mifepristone will furnish surgical intervention or if the patient will be referred. If the latter, the treating health care provider must give the patient the name, address, and phone number of this referred provider. To ensure that the quality of care is not different for patients who are treated by physicians who have the skill for surgical intervention (as in the clinical trials) compared to those treated by physicians who must refer patients for surgical intervention, FDA has proposed and the Population Council has agreed to structure a Phase 4 monitoring study. This monitoring study incorporates study questions of four of the original six Phase 4 commitments. See Phase 4 Commitments for additional information.

Finally, the one hour travel distance restriction in the clinical trial was intended to ensure access by patients to emergency or health care services. This concern has been dealt with through the labeling, which makes it clear that if there isn't adequate access to emergency services, the medication is contraindicated.

APPEARS THIS WAY
ON ORIGINAL

5

Subpart H

In the February 18, 2000 approvable letter, FDA stated that the eventual approval of this drug would be under Subpart H. (21 CFR 314.500-314.560). This subpart applies to certain new drugs that have been studied for their safety and effectiveness in treating serious or life-threatening illnesses and that provide meaningful therapeutic benefit to patients over existing treatments. FDA has determined that the termination of an unwanted pregnancy is a serious condition within the scope of Subpart H. The meaningful therapeutic benefit over existing surgical abortion is the avoidance of a surgical procedure. Subpart H applies when FDA concludes that a drug product shown to be effective can be safely used only if distribution or use is restricted, such as to certain physicians with special skills or experience. In the case of mifepristone, the Population Council proposed and FDA agreed that this drug will be directly distributed via an approved plan that ensures the physical security of the drug to physicians who meet specific qualifications. Under 21 CFR 314.520, distribution of mifepristone is restricted as described below.

- Mifepristone must be provided by or under the supervision of a physician who meets the following qualifications:
  - Ability to assess the duration of pregnancy accurately
  - Ability to diagnose ectopic pregnancies
  - Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or have made plans to provide such care through other qualified physicians, and are able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary
  - Has read and understood the prescribing information of Mifeprex
  - Must provide each patient with a Medication Guide and must fully explain the procedure to each patient, provide her with a copy of the Medication Guide and Patient Agreement, given her an opportunity to read and discuss both the Medication Guide and the Patient Agreement, obtain her signature on the Patient Agreement and must sign it as well
  - Must notify the sponsor or its designate in writing as discussed in the Package Insert under the heading DOSEAGE AND ADMINISTRATION in the event of an on-going pregnancy, which is not terminated subsequent to the conclusion of the treatment procedure
  - Must report any hospitalization, transfusion or other serious events to the sponsor or its designate
  - Must record the Mifeprex package serial number in each patient's record

- With respect to the aspects of distribution other than physician qualifications described above, distribution of Mifeprex will be in accordance with the system described in the Population Council's submission of March 30, 2000, which includes the following:
  - Secure manufacturing, receiving, and holding areas for the drug
  - Secure shipping procedures, including tamper-proof seals
  - Controlled returns procedures
  - Tracking system ability to trace individual packages to the patient level, while maintaining patient confidentiality
  - Use of authorized distributors and agents with necessary expertise to handle distribution requirements for the drug
  - Provision of drug through a direct, confidential physician distribution system that ensures only qualified physicians will receive the drug for patient dispensing

The Population Council agreed to approval under Subpart H in their letter of September 15, 2000.

APPEARS THIS WAY
ON ORIGINAL

6

MIF 001750

FDA 0228

<u>Phase 4 Commitments</u>

In 1996, the Population Council committed to 6 post-marketing studies: 1) to monitor the adequacy of the distribution and credentialing system; 2) to follow up on the outcome of a representative sample of mifepristone treated women who have surgical abortion because of method failure; 3) to assess the long term effects of multiple use of the regimen; 4) to ascertain frequency with which women follow the complete treatment regimen and the outcome of those who do not; 5) to study the safety and efficacy of the regimen in women under age 18, over age 35, and who smoke; 6) to ascertain the effect of the regimen on children born after treatment failure.

During this review cycle, items 1, 2, 4 and 5 were revised and integrated into a monitoring study to ensure providers who did not have surgical intervention skills and referred patients for surgery had similar patient outcomes as those patients under the care of physicians who possessed surgical skills (such as those in the clinical trial). This study specifically addresses adequacy of qualifications (#1). FDA reviewed the protocols from the Population Council submitted on September 7, 2000 and provided a revised protocol on September 13, 2000 in which the investigators collect data on safety outcomes (#2), return for their follow up visits (#4), and include all ages (#5) and collect smoking status (#5). Commitment #2 was defined by the Advisory Committee discussions of 1996 surrounding the question of whether certain physician specialties would have higher rates of problems encountered with medical abortion. This study specifically will investigate the performance of specialties with surgical skills compared to those that refer for surgical interventions with respect to incidence of medical abortion failures.

The Population Council agrees to study ongoing pregnancies and their outcomes through a surveillance, reporting, and tracking system (#6). This protocol summary and a summary for the monitoring system was received on September 19, 2000 and both were found to be adequate.

The Population Council asked that Commitment #3 (to assess the long term effects of multiple use of the regimen) be waived because it would not be feasible to identify and enroll sufficient numbers of repeat users of the drug, especially given privacy issues. In addition, the pharmacology of mifepristone does not suggest any carry over effect after one-time administration. The Agency agrees with this assessment.

As a note, this cycle the Population Council provided new data concerning Commitment #5 (to study the safety and efficacy of the regimen in women under age 18, over age 35, and who smoke), from Spitz et al. This study had 106 women ages 35 years or older as well as 51 subjects under age 20, all of whom were 49 days or less since their last menstrual period. The data on the older women is informative and of meaningful sample size. FDA agrees there is no biological reason to expect menstruating females under age 18 to have a different physiological outcome with the regimen. The Sptiz data actually suggests a trend towards increased success of medical abortion with younger patients. However, as these age groups were not part of the NDA indication and the data on safety and effectiveness were only reviewed for the indication's age group (18-35 years of age), the trials excluded patients younger than 18 years old, and the raw data from Sptiz have not been submitted for review, the labeling states the safety and efficacy in these groups have not been studied. The Population Council will collect outcomes in their Phase 4 studies of women of all ages to further study this issue. With respect to smokers, the Population Council will study smokers of various ages to collect safety information. In sum, the changes in postmarketing commitments reflect current postmarketing questions given establishment of final labeling, Medication Guide, and distribution system, along with availability of additional clinical data with the drug since 1996.

The postmarketing audit of signed Patient Agreement forms was discussed above.

APPEARS THIS WAY
ON ORIGINAL

7

Public Comments Considered

The Food and Drug Administration received over 1,000 letters or emails from the public about mifepristone. Most comments objected to various restrictions of the drug's distribution. For example, many letters opposed press reports of an alleged FDA public registry of doctors who dispense mifepristone. Other letters focused on the research uses of mifepristone for neurologic and oncologic diseases and the concern that restricting distribution after approval would constrain off-label uses. Still other letters expressed misunderstanding that experimental indications that are subject to INDs would be limited by an approval of mifepristone with distribution restrictions. These comments were reviewed and considered.

Risk Management Program

Risk management for a drug has the goal of optimizing the use of a product by maximizing its benefits and minimizing its risks. Interventions to manage risk include education to physicians, patients, and the public, labeling (including warnings, precautions, contraindications, dosage and administration, and Medication Guide), restriction of product use or supply, and packaging changes. This drug is being approved under Subpart H (restrictions on distribution) as part of the risk management program. The Population Council and FDA have identified the areas below, among others, that contribute to drug safety and effectiveness:

1. Proper selection of patients via physicians who are qualified to do so by dating pregnancies and diagnosing ectopics,
2. Qualified physicians to administer or supervise the administration of the medication
3. Compliance with the regimen by physicians and patients through education and monitoring
4. Safety and effectiveness information that fully informs patients and physicians about the risks and benefits of the treatment
5. Evaluation of physician qualifications through Phase 4 studies has been discussed in above sections.
6. Physical packaging in unit of dosing to ensure proper dose and provision of Medication Guide with each dose
7. Active patient participation in the treatment through the Patient Agreement and Medication Guide with an audit of signed Patient Agreement to ensure compliance
8. Active programs to get physicians to report adverse events and ongoing pregnancies to provide accurate risk information
9. Commitment to review and revise the risk management program for improved public health

All components of this risk management program have been discussed above, including the Medication Guide, the labeling that includes the Prescriber's and Patient Agreement forms, approval under Subpart H, and Phase 4 studies to evaluate risk management interventions and to gather data on risks.

In summary, all approval issues related to the NDA have been addressed adequately.

**APPEARS THIS WAY ON ORIGINAL**

8

MIF 001752

FDA 0230