**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

AMERICAN COLLEGE OF
OBSTETRICIANS AND
GYNECOLOGISTS, *et al.*,

                     Plaintiffs,

         vs.

UNITED STATES FOOD AND DRUG
ADMINISTRATION, *et al.*,

                    Defendants.

Case No. 8:20-cv-1320-TDC

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR RENEWED MOTION TO
STAY THE PRELIMINARY INJUCTION AND FOR AN INDICATIVE RULING
<u>DISSOLVING THE PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 2

STANDARD OF REVIEW ............................................................................................ 3

ARGUMENT .................................................................................................................. 4

    I.  Defendants Are Likely to Succeed on the Merits of Plaintiffs' Undue Burden
       Claim Due to Changed Circumstances. .......................................................... 5

        A.  Reduced Travel Risks ........................................................................... 6

        B.  Availability of Medical Facilities to Dispense Mifeprex .......................... 11

        C.  Childcare and Transportation .................................................................. 14

        D.  Greater Economic Opportunity ............................................................... 19

    II.  The Remaining *Hilton* Factors Again Favor a Stay. ..................................... 22

    III. Changed Circumstances Also Warrant Staying the Nationwide Scope of
        the Preliminary Injunction Because Any Variation in Infection Rates and
        Reopening Plans Renders Nationwide Relief Improper. .................................. 23

    IV. Changed Circumstances Warrant an Indicative Ruling Dissolving the Preliminary
        Injunction Upon Remand. ............................................................................... 24

CONCLUSION .............................................................................................................. 25

## INTRODUCTION

On July 13, 2020, this Court preliminarily enjoined enforcement, during the COVID-19 pandemic, of longstanding in-person dispensing and signature requirements on the use of Mifeprex (mifepristone)[1] for medication abortion ("Mifeprex in-person requirements").  *See* Order (ECF No. 91); Prelim. Inj. (ECF No. 92).  Now, at the Supreme Court's invitation, Defendants seek relief from the injunction "on the ground that relevant circumstances have changed."  Order, *FDA v. ACOG*, No. 20A34 (U.S. Oct. 8, 2020).

The injunction rested on the premise that "the extensive evidence relating to the burdens of the In-Person Requirements during the COVID-19 pandemic supports the 'commonsense inference' that they present a substantial obstacle to a large fraction of the women for whom the In-Person Requirements are relevant."  Mem. Op. at 63 (ECF No. 90) (quoting *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2317 (2016)).  In the intervening months, however, those evidentiary underpinnings have changed.  As States have reopened with the benefit of public health precautions, a one-time visit to medical facilities presents no greater risk than engaging in a variety of other public activities that state public health officials have judged safe to resume.  And women now have a greater range of safe, affordable childcare and transportation options than earlier in the pandemic.  These changed circumstances demonstrate that the Mifeprex in-person requirements do not present a substantial obstacle under *Casey*'s undue-burden test to women seeking medication abortion during the pandemic.

Defendants therefore renew their motion to stay this Court's preliminary injunction.  And although the Court lacks jurisdiction to dissolve the preliminary injunction while Defendants'

---

[1] The use of "Mifeprex" in this motion refers collectively to the brand-name and generic versions of the drug.

appeal of that injunction is pending, Defendants also move for an indicative ruling that the injunction should be dissolved, *see* Fed. R. Civ. P. 62.1(a).

## BACKGROUND

On May 27, 2020, Plaintiffs filed their Complaint and Motion for Preliminary Injunction, arguing that the U.S. Food and Drug Administration's (FDA) Mifeprex in-person requirements violated substantive due process and equal-protection principles under the Fifth Amendment. *See* Compl. ¶¶ 123, 125 (ECF No. 1); Pls.' Mot. for Prelim. Inj. (ECF No. 11). Following briefing and oral argument, the Court granted Plaintiffs' motion in part, finding that Plaintiffs were likely to succeed on their due process claim. Mem. Op. at 63 (ECF No. 90). The Court determined that, "taken together, the burdens of the In-Person Requirements, in the specific context of the unprecedented COVID-19 pandemic, impose a 'substantial obstacle in the path of women seeking an abortion.'" *Id.* at 50 (quoting *Whole Woman's Health*, 136 S. Ct. at 2317–18).

The Court issued a nationwide preliminary injunction enjoining Defendants from enforcing the Mifeprex in-person requirements "until 30 days after the end of the Public Health Emergency declared by the Secretary . . . associated with [COVID-19]." Prelim. Inj. ¶ 2 (ECF No. 92); *see also* Mem. Op. at 78–79. Shortly thereafter, the Court denied Defendants' request to stay the preliminary injunction pending appeal, *see* ECF Nos. 104, 110, and granted in part Plaintiffs' motion for clarification regarding the dispensing of Mifeprex through mail-order pharmacies, *see* ECF Nos. 109, 119.

On July 22, Defendants appealed to the Fourth Circuit from the Court's Memorandum Opinion, Order, and Preliminary Injunction. *See* ECF No. 98. Defendants then filed a motion to stay the preliminary injunction pending appeal, which the Fourth Circuit denied. Order, *ACOG v. FDA*, No. 20-1824 (4th Cir. Aug. 13, 2020) (ECF No. 30).

On August 26, Defendants asked the Supreme Court to stay the preliminary injunction pending appeal. *FDA v. ACOG*, No. 20A34 (U.S. Aug. 26, 2020). On October 8, the Supreme Court issued an order holding Defendants' application in abeyance to permit the District Court to "promptly consider a motion by the Government to dissolve, modify, or stay the injunction, including on the ground that relevant circumstances have changed." Order, *FDA v. ACOG*, No. 20A34 (U.S. Oct. 8, 2020). The Supreme Court stated that the District Court "should rule within 40 days of receiving the Government's submission." *Id.*[2]

## STANDARD OF REVIEW

A party appealing a preliminary injunction may move the district court to stay its effect under Federal Rule of Civil Procedure 62(d). In deciding such a motion, a district court must consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).

A district court may also dissolve a preliminary injunction. "Interlocutory orders and judgments are . . . left within the plenary power of the [c]ourt that rendered them to afford such relief from them as justice requires." *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1473 (4th Cir. 1991) (quoting 7 Moore's Federal Practice, ¶ 60.20, p. 60-170).

Although a district court generally lacks jurisdiction to dissolve an injunction while it is pending on appeal, *see, e.g.*, *Doe v. Pub. Citizen*, 749 F.3d 246, 258 (4th Cir. 2014), Rule 62.1 facilitates an indicative ruling. Rather than defer or deny the requested relief, "the court may . . .

---

[2] In an effort to preserve judicial economy and avoid motions practice on Plaintiffs' discovery requests for supplemental information, *see* ECF Nos. 135, 139, Defendants today are responding to each of Plaintiffs' remaining questions, while preserving their objections.

state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue." Fed. R. Civ. P. 62.1(a). The movant then conveys that indicative ruling to the court of appeals to determine whether remand for a decision is appropriate. *See* Fed. R. Civ. P. 62.1(b), (c); Fed. R. App. P. 12.1; *In re Under Armour Sec. Litig.*, 815 F. App'x 748, 749 (4th Cir. 2020) (per curiam).

## ARGUMENT

On July 13, the Court held that Plaintiffs were likely to succeed on their undue burden claim that the Mifeprex in-person requirements posed a substantial obstacle to women's ability to access abortion during the pandemic, and granted an injunction for the duration of the pandemic (plus thirty days). *See* Mem. Op. at 50, 63 (ECF No. 90); Prelim. Inj. ¶ 2 (ECF No. 92). That ruling rested on perceived risks of travel to medical facilities, reduced access to such facilities, transportation and childcare concerns, and the economic impact of the pandemic.

Since July, however, those underpinnings have changed such that Plaintiffs are no longer likely to prevail on their undue burden claim.[3] Greater medical understanding of COVID-19 has reduced the likelihood of serious complications from infection. Meanwhile, medical facilities do not face the same pressures to close that forced many of them to do so previously. And schools, daycares, and public transportation have reopened to varying degrees as well, with the result that safe and affordable childcare and transportation are now more available than they were earlier in the pandemic.

---

[3] Defendants do not challenge in this Motion the Court's determination that, as of July 13, Plaintiffs established a likelihood of success on the merits of their undue burden claim. *See* Mem. Op. at 63. That determination has already been challenged by Defendants and is currently pending on appeal in the Fourth Circuit.

Despite the current spike in infection rates, these developments demonstrate that the Mifeprex in-person requirements do not present a substantial obstacle to women seeking a medication abortion during the pandemic. The remaining factors of the *Hilton* standard likewise support Defendants' renewed request for a stay of the preliminary injunction.  And even insofar as some jurisdictions may be less far along in reopening or have higher infection rates, the variation among States and localities, in combination with the aforementioned developments, underscores that, at the very least, the nationwide scope of the injunction is inappropriate.

**I.    Defendants Are Likely to Succeed on the Merits of Plaintiffs' Undue Burden Claim Due to Changed Circumstances.[4]**

In holding that the Mifeprex in-person requirements "during the COVID-19 pandemic . . . present a substantial obstacle to a large fraction of the women for whom [they] are relevant," Mem. Op. at 63, the Court made specific findings regarding the burdens on such patients.  Those findings concerned: increased health risks associated with travel to medical facilities; closure or limited capacity of medical facilities; greater health and transportation concerns for minority and economically-disadvantaged women; the challenges of making childcare arrangements; and further transportation and childcare difficulties for minorities given the greater economic effects of the pandemic on them.  *See id.* at 42–50.  Since July 13, however, these burdens have either been mitigated or resolved.  Accordingly, they do not present a substantial obstacle under *Casey*'s undue-burden test to women seeking medication abortion during the pandemic.  Moreover, the

---

[4] Given the Supreme Court's Order, Defendants do not address Plaintiffs' likelihood of success "on the merits of the appeal," *Long v. Robinson*, 432 F.2d 977, 979 (4th Cir. 1970), because that appeal concerns a preliminary injunction based on circumstances that existed as of July 13, and the Supreme Court has expressly authorized Defendants to file a motion to "dissolve, modify, or stay" that injunction.  Order, *FDA v. ACOG*, No. 20A34 (U.S. Oct. 8, 2020).  Accordingly, Defendants argue that changed circumstances render Plaintiffs unlikely to succeed on the underlying merits of their case.

mere fact of variation in the factual underpinnings across time and among States shows that an indefinite, nationwide injunction is improper.  The Court should therefore stay the preliminary injunction pending resolution of merits proceedings in this Court, or at least stay the injunction's effect insofar as it is broader than necessary to redress Plaintiffs' established injuries.

### A.  Reduced Travel Risks[5]

At the threshold, the Court determined that "travel to medical facilities [was] fraught with health risk to [the patients] themselves, medical professionals, others they encounter during such trips, and the members of their households to whom they return."  Mem. Op. at 44–45; *see also id.* at 46–47 (emphasizing this risk for minority and economically-disadvantaged women).  Yet, since the initial wave of lockdown measures, state and local officials have, with the benefit of public health guidance, judged it safe to resume a variety of activities of normal life that require travel, including activities far less essential than medical visits.  Those judgments, which reflect improvements to experts' and the public's understanding of how to limit serious consequences from COVID-19, are entitled to deference.

Maryland, in particular, serves as a case in point.  In Maryland, even before this Court's preliminary injunction,

> those responsible for public health . . . thought it safe for women (and men) to leave the house and engage in numerous activities that present at least as much risk as visiting a clinic—such as indoor restaurant dining, visiting hair salons and barber shops, all sorts of retail establishments, gyms and other indoor exercise facilities, nail salons, youth sports events, and . . . the State's casinos.

---

[5] For evidence of changed circumstances, Defendants not only rely on facts in declarations but also ask the Court to take judicial notice of further "fact[s] that [are] not subject to reasonable dispute because" they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2); *see also* 201(c)(2). Most such facts come from government websites.  *See, e.g.*, *United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) (observing that the Fourth Circuit is among "numerous" courts that "routinely take judicial notice of information contained on state and federal government websites").

Order, *FDA v. ACOG*, No. 20A34, 2020 WL 5951467, at *2 (U.S. Oct. 8, 2020) (Alito, J., dissenting) (citing Maryland reopening announcements in June).  Since then, other states and localities have followed suit.  For example, in September, New York City—once the locality hardest hit by COVID-19— joined the list of jurisdictions permitted to resume indoor dining, with proper precautions.[6]  These judgments by public health officials that it is safe for businesses to reopen and for individuals to travel from their homes to patronize them "should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health."  *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1614 (2020) (Roberts, C.J., concurring).  These decisions by public health officials reflect improved understanding of the risks of COVID-19 and the tools for managing those risks.

The precautionary measures that Americans are now aware of and have access to have mitigated the risks of travel such that an individual trip does not increase the risk of contracting COVID-19 beyond that individual's baseline risk.  For example, in late August 2020, National Institutes of Health (NIH) Director Francis Collins promoted an NIH-backed study published earlier in the month that brought the progress on face masks into focus.[7]  Whereas "several months" beforehand, "recommendations on wearing a mask varied across the United States and around the world,"[8] researchers who performed simulations "found that the total number of deaths

---

[6] *See* Governor Cuomo Announces Indoor Dining in New York City Allowed to Resume Beginning September 30 with 25 Percent Occupancy Limit, N.Y. State (Sept. 9, 2020), https://www.governor.ny.gov/news/governor-cuomo-announces-indoor-dining-new-york-city-allowed-resume-beginning-september-30-25.

[7] Francis Collins, *Masks Save Lives*, NIH Director's Blog (Aug. 25, 2020), https://directorsblog.nih.gov/2020/08/25/masks-save-lives/.

[8] *Id.* Summarizing the early uncertainties, a scientific article published before this Court's July 13 Order opened by stating that "[f]ace mask use by the general public for limiting the spread of the COVID-19 pandemic is controversial, though increasingly recommended, and the potential of this intervention is not well understood."  Steffen E. Eikenberry et al., *To Mask or Not to Mask: Modeling the Potential for Face Mask Use by the General Public to Curtail the COVID-19*

and infections declined as the availability and effectiveness of face masks increased."[9]   Dr. Collins's public post also drew attention to a late July paper suggesting that mask wearing may furnish greater protection to the wearer—not just to others—than previously thought, further bolstering the rationale for this precaution.[10]

As the scientific evidence has evolved, the Centers for Disease Control and Prevention (CDC) has repeatedly supplemented its April recommendation to wear masks with further guidance for their effective use.  The most recent updates to the CDC's webpages were in August and October.[11]  These pages explain mask efficacy, urge mask wearing in public, and address mask selection, proper wearing, safe removal and cleaning, and special considerations for children.

State mask mandates further reduce the risk of visiting a medical office.  For example, on July 15, two days after this Court imposed its preliminary injunction, Alabama issued a statewide mask mandate that generally applied to people within six feet of each other in "indoor space[s] open to the general public," "vehicle[s] operated by a transportation service," and "outdoor public space[s] where ten or more people are gathered."  Decl. of Scott Harris, M.D., M.P.H., ¶ 18, Ex. 1

---

*Pandemic*, Infectious Disease Modelling (May 2, 2020), https://www.ncbi.nlm.nih.gov/research/coronavirus/publication/32355904.

[9] Collins, *supra* note 7.  Another study published in August leveraged mathematical modeling to conclude that "wearing a face mask can be effectively combined with social distancing to flatten the epidemic curve."  Tom Li et al., *Mask or No Mask for COVID-19: A Public Health and Market Study*, PLoS One (Aug. 14, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7428176/.

[10] Collins, *supra* note 7 (citing Monica Gandhi et al., *Masks Do More Than Protect Others During COVID-19: Reducing the Inoculum of SARS-CoV-2 to Protect the Wearer*, J. Gen. Internal Med. (July 31, 2020), https://doi.org/10.1007/s11606-020-06067-8).

[11] *See How to Select Masks*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/about-face-coverings.html (Oct. 29, 2020); *Considerations for Wearing Masks*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html (Aug. 7, 2020).

("Harris Decl.").[12]  As of July 31, Maryland's expanded mandate generally applied to everyone over the age of five in circumstances such as taking public transit and "obtaining healthcare services."[13]

Moreover, a peer-reviewed study published October 15 reinforces the growth in voluntary mask wearing and compliance with mandates.  Whereas in early June, about 41.5% of shoppers entering a sample of Milwaukee retail stores were wearing face coverings, by early August— shortly after stores' own mandates and then a state mandate took effect—that share had soared to over 90%.[14]  Given the data on the efficacy of masks at reducing the transmission of COVID-19, such mandates lower the risk of travel overall, including to medical offices.  Importantly, the risks of making a one-time visit to a doctor's office are no different from the risks associated with any other outing outside the home, such as going to the store, picking up food, or engaging in any other activities that involve travel.

Additionally, testing for COVID-19 has ramped up considerably since earlier in the pandemic.  Testing jumped sixty percent from the week of July 5–11 (1,650,622 tests) to the most recent week for which data is available, October 18–24 (2,646,697 tests).[15]  Contributing to the

---

[12]    *See also* Ark. Exec. Order No. 20-37 (July 16, 2020), https://governor.arkansas.gov/images/uploads/executiveOrders/EO_20-43.pdf (similar Arkansas mandate). Kentucky's mask mandate "was initially instituted on July 10, 2020, and it has been renewed every month since its inception."  Decl. of Joseph Fawns, ¶ 25, Ex. 2.

[13]  Order of the Gov. of the State of Maryland at 9, No. 20-07-29-01 (July 29, 2020), https://governor.maryland.gov/wp-content/uploads/2020/07/Gatherings-10th-AMENDED-7.29.20.pdf.

[14]  Michael H. Haischer et al., *Who Is Wearing a Mask? Gender-, Age-, and Location-Related Differences During the COVID-19 Pandemic*, PLoS ONE (Oct. 15, 2020), https://doi.org/10.1371/journal.pone.0240785.

[15]    *Compare COVIDView Summary Ending July 11, 2020*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/past-reports/07172020.html (July 17, 2020), *with COVIDView Weekly Summary: Key Updates for Week 43, Ending October*

momentum, ten States entered a Bipartisan Interstate Testing Compact in August, collectively committing to buy five million rapid antigen tests.[16]  In September, Maryland was the first of those States to "move forward with an order" by purchasing 250,000 such tests—as well as on-site diagnostic equipment—while "[n]early all" of the others had "signed letters of commitment."[17] Increases in infection rates are inevitable before a vaccine is available, but the greater amount of testing will facilitate mitigating the spread of the virus by allowing for isolation and reducing exposure to those who are infected.

Even in the event that a woman were to contract or spread SARS-CoV-2, the virus that causes COVID-19, the prognosis for COVID-19 patients has improved since the preliminary injunction.  Public health authorities have continued to refine treatment guidance.  Armed with more clinical data, the COVID-19 Treatment Guidelines Panel, including CDC, NIH, and FDA,[18] adjusted its guidelines for treating patients as recently as October 9.[19]  The Panel "recommend[ed] strategies for managing patients with different severities of disease," based in part on scientific studies published on July 17, September 2, and October 8.[20]  In Maryland, which has expanded

---

*24, 2020*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html (Oct. 30, 2020).

[16] *Governor Hogan Announces Acquisition of 250,000 Rapid Antigen Tests from Becton Dickinson Through Bipartisan Interstate Compact with Rockefeller Foundation*, Office of Gov. Larry Hogan, https://governor.maryland.gov/2020/09/10/governor-hogan-announces-acquisition-of-250000-rapid-antigen-tests-from-becton-dickinson-through-bipartisan-interstate-compact-with-rockefeller-foundation/ (last visited Oct. 30, 2020) (Arkansas, Louisiana, Maryland, Massachusetts, Michigan, North Carolina, Rhode Island, Ohio, Utah, and Virginia).

[17] *Id.*

[18] *COVID-19 Treatment Guidelines: Introduction*, NIH, https://www.covid19treatmentguidelines.nih.gov/introduction/ (Oct. 9, 2020).

[19] *See Therapeutic Management of Patients with COVID-19*, NIH, https://www.covid19treatmentguidelines.nih.gov/therapeutic-management/ (Oct. 9, 2020).

[20] *Id.*

hospital surge capacity during the pandemic, "[a]t the beginning of September, hospitalizations had declined more than 77% since they peaked at 1,711, and [the State] ha[d] seen a nearly 30% decline in ICU levels since July 25."[21]

Data from three clinical trials also informed FDA's decision, on October 22, to grant its first approval of a COVID-19 treatment.[22]  The final report of the last clinical trial showed that "[p]atients who received remdesivir were quicker to recover"; "[r]emdesivir also improved mortality rates for those receiving supplemental oxygen"; and "remdesivir treatment may prevent patients from progressing to more severe respiratory disease."[23]  Following FDA's approval of the remdesivir drug, Veklury, hospitals and comparable facilities may use it with "adult and pediatric patients 12 years of age and older and weighing at least 40 kilograms (about 88 pounds) for the treatment of COVID-19 requiring hospitalization."[24]  Previously, medical providers had to rely on FDA's Emergency Use Authorization of Veklury, but now there is additional evidence of the safety and efficacy of Veklury for the treatment of COVID-19.[25]

### B.  Availability of Medical Facilities to Dispense Mifeprex

On July 13, this Court observed that, "at various times, the pandemic has caused healthcare facilities providing medication abortion services to close," and "[e]ven when medical offices

---

[21]  *Maryland Strong: Roadmap to Recovery*, Office of Gov. Larry Hogan, https://governor.maryland.gov/recovery/ (last visited Oct. 30, 2020).

[22]  Press Release, FDA, FDA Approves First Treatment for COVID-19 (Oct. 22, 2020), https://www.fda.gov/news-events/press-announcements/fda-approves-first-treatment-covid-19.

[23]  Erin Bryant, *Final Report Confirms Remdesivir Benefits for COVID-19*, NIH Rsch. Matters (Oct. 20, 2020), https://www.nih.gov/news-events/nih-research-matters/final-report-confirms-remdesivir-benefits-covid-19.

[24]  Press Release, FDA, *supra* note 22.

[25]  *See id.*; 21 C.F.R. § 314.105(c) ("FDA will approve a[] [new drug application] after it determines that the drug meets the statutory standards for safety and effectiveness, manufacturing and controls, and labeling . . . .").

reopen, their capacity to serve patients may be so limited that they are not able to offer medication abortion appointments."  Mem. Op. at 45.  The Court also expressed concern that "offices that have reopened may close for a second time."  *Id.* at 46.

However, since these unspecified times early in the pandemic,[26] lockdown restrictions closing or substantially restricting medical offices or facilities have been lifted or substantially scaled back in States such as New York, where elective procedures could resume in June.[27]  *See also, e.g.*, Decl. of Joseph Fawns, ¶ 15, Ex. 2 ("Fawns Decl.") (observing that "Kentucky lifted restrictions on obtaining health care procedures" on May 13); Decl. of Gary J. Anthone, M.D., ¶ 5, Ex. 3 ("Anthone Decl.") (entire State of Nebraska had lifted "restrictions on elective surgeries and procedures" by July 6).[28]  Indeed, it is not even clear that lockdowns and restrictions on elective procedures ever applied to abortions.  *See* Decl. of Matthew Foster, ¶ 16, Ex. 4 ("Foster Decl.") (observing that "essential activities" exempt from stay-home order included securing "healthcare, including abortions"); Fawns Decl. ¶ 8 (expressing understanding that in Kentucky, "abortion procedures were never ordered to cease").

Moreover, medical facilities have been permitted to expand capacity towards pre-COVID-19 levels—consistent with the efforts of States and localities to reopen other industries and

---

[26] In portions of this brief, Defendants refer to developments that may have begun prior to July 13—some during the pendency of the preliminary injunction motion filed on May 27—but the cumulative effects of those developments since July 13 constitute a change in circumstances today.

[27] Memorandum from N.Y. Dep't of Health, Updated Guidance for Resumption of Non-Essential Elective Surgeries and Non-Urgent Procedures in Hospitals, Ambulatory Surgery Centers, Office Based Surgery Practices and Diagnostic and Treatment Centers (June 14, 2020) https://coronavirus.health.ny.gov/system/files/documents/2020/06/doh_covid19_electivesurgery _update_061420.pdf.

[28] A more recent Nebraska restriction on elective procedures is limited to a narrow subset of hospitals, if any.  *See* Anthone Decl. ¶ 5 (imposing the restriction through November 30 only on hospitals that do not allocate 10% of certain types of bed space for COVID-19 care).

institutions.  *See, e.g.*, Fawns Decl. ¶ 15 (noting that when Kentucky removed health care procedure restrictions in May, "[o]ffices were asked to resume at limited capacity," but that two weeks later, "doctors' offices were permitted to resume at full capacity").  Even after reopening or resuming full capacity, medical facilities continue to implement public health precautions to protect their patients and personnel.  *See id.* ¶ 8 (noting that in Kentucky, "all health care facilities were directed to eliminate traditional waiting and common seating rooms and utilize non-traditional alternatives like calling ahead, pre-registration, or waiting in a car until one's appointment time"); *cf.* Anthone Decl. ¶ 6 (similar "best practices" in Nebraska).  Although the CDC recommends "us[ing] telemedicine, if available," the agency's recently updated guidance includes COVID-19 precautions for those instances in which a patient "must visit in-person"[29] and recognizes that there may be times where medical services need to be provided in person.

The prospect of reduced medical facility capacity was particularly concerning to the Court because "the demand for abortion services is likely increasing because of the greater challenges associated with obtaining contraception and the heightened economic challenges faced by women who become pregnant and their families."  Mem. Op. at 45–46.  But even if the pandemic has spurred greater demand for abortion, there is no sign that in-person requirements have prevented women from obtaining it in either Indiana or Nebraska.  Both States appear to have in-person dispensing requirements for medication abortion.  *See* Foster Decl. ¶¶ 17–20 (citing Ind. Code § 16-34-2-1); Anthone Decl. ¶ 14 (citing Neb. Rev. Stat. § 28-335).  If Plaintiffs' claim that such requirements pose a substantial obstacle to abortion during the pandemic were true, one would expect abortions to have declined in those States during the pandemic.

---

[29] *See Doctor Visits & Getting Medicines*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/doctor-visits-medicine.html (Sept. 11, 2020).

Yet the opposite has happened: the total number of abortions performed in Indiana and Nebraska during the pandemic has *exceeded* the totals during the same period in 2019. *See* Foster Decl. ¶¶ 15–16, 20, & table (tallying medication and surgical abortions in Indiana together each month from March through September in both years);[30] Anthone Decl. ¶ 13 (same in Nebraska). That March through June abortion counts were almost all *higher* in 2020 than in 2019 suggests that the presence of the Mifeprex in-person requirements during the pandemic did not keep women from obtaining abortions. Women also appear to be voluntarily returning to doctors' offices for routine procedures.[31]

### C.  Childcare and Transportation

In its Memorandum Opinion, the Court expressed concern that minority and low-income women seeking abortions would often lack a vehicle of their own and would therefore face greater risk of COVID-19 infection from using public transportation, ride-sharing services, or rides with friends. Mem. Op. at 46–47. The Court also found that women who have children would face further difficulties and disease risks from arranging childcare "[b]ecause many schools and childcare facilities ha[d] closed" and "many medical facilities . . . d[id] not allow patients to bring children . . . into the medical facility during the pandemic." *Id.* at 48. Assuming the accuracy of those findings, the situation has improved since the Court issued its preliminary injunction.

---

[30] In 2019, medication abortions constituted 44% of total reported abortions in Indiana. Ind. State Dep't of Health, Terminated Pregnancy Report 2019, at 14 (June 30, 2020), https://www.in.gov/isdh/files/2019%20Indiana%20Terminated%20Pregnancy%20Report.pdf.

[31] *See* Anna Wilde Mathews & Mike Cherney, *Covid-19 Outbreaks Led to Dangerous Delay in Cancer Diagnoses*, Wall St. J. (Oct. 15, 2020), https://www.wsj.com/articles/covid-19-outbreaks-led-to-dangerous-delay-in-cancer-diagnoses-11602756013 (drawing on UnitedHealth's mammogram claims to show that, after a dramatic drop early in the pandemic, visits "returned [] to typical levels" by July).

The need to arrange childcare has changed since July 13.  Most importantly, Defendants understand that every State has permitted in-person schooling at least in part this academic year[32]—a marked change from state orders prohibiting it early in the pandemic, *see, e.g.*, Harris Decl. ¶ 13 (Alabama order in March).  And given the opportunity to resume in-person schooling, many local officials have evidently done so.  *See, e.g.*, Decl. of Thomas E. Dobbs, M.D., M.P.H., ¶ 9, Ex. 5 ("Dobbs Decl.") ("all Mississippi schools, including K-12, . . . reopened for in-person instruction" by mid-August); Fawns Decl. ¶ 27 (159 of 171 Kentucky school districts "ha[d] started in-person classes" by October 27).  That list includes Maryland, which announced on August 27 that "every county school system in Maryland is now fully authorized to begin safely reopening."[33]  At that time, at least "16 of [Maryland's 24] local school systems ha[d] developed plans for returning children to schools for some form of in-person instruction this calendar year."[34]

States have gone to great lengths to ensure safe school reopening and operation.  Decl. of John Budd, ¶ 11, Ex. 6 ("Budd Decl.") (Oklahoma's July 23 adoption of school safety protocols governing reopening); Fawns Decl. ¶ 26 (noting Kentucky's September 14 regulation regarding

---

[32]     *Map:     Where     Are     Schools     Closed?*,     Educ.     Week, https://www.edweek.org/ew/section/multimedia/map-covid-19-schools-open-closed.html    (Oct. 27, 2020) (identifying four States where "[i]n-person instruction must be available to all students, either full- or part-time"; thirty-nine other States where "[i]n-person instruction decisions are currently being made on a local level, with states only providing guidelines or recommendations"; seven "[p]artial closure" states where "[f]ull-time in-person instruction is either not allowed in certain regions of the state or is only available for certain age groups," though "[h]ybrid instruction may be allowed").

[33] *Maryland Strong*, *supra* note 21.

[34] *Governor Hogan: Every County School System Now Fully Authorized to Begin Safely Reopening*, Office of Gov. Larry Hogan, https://governor.maryland.gov/2020/08/27/governor-hogan-every-county-school-system-now-fully-authorized-to-begin-safely-reopening/ (last visited Oct. 30, 2020); *see also School Systems Links*, Md. State Dep't of Educ., http://marylandpublicschools.org/about/pages/school-systems/index.aspx (last visited Oct. 27, 2020) (noting 24 local school systems).

"Covid-19 reporting requirements" facilitates "a color-coded map to help school administrators make timely adjustments"). Although Maryland gave local schools latitude as to some aspects of their reopening plans, on July 22 the State announced it would "set a series of guardrails," including precautions like mandated mask wearing.[35]  And New York City figures show that local precautions can keep case counts low: Only 0.04% of students in the nation's largest school district have tested positive since September 14.[36]

Many locales have also resumed school-related after-school activities.  On September 30, Mississippi removed or reduced restrictions on a number of additional public activities, including "K-12 outdoor and indoor organized extracurricular events (athletic competitions, band performances and concerts, cheer performances, and theater performances)."  Dobbs Decl. ¶¶ 10-14.  Other States have likewise removed restrictions on youth sports.  *See e.g.*, Anthone Decl. ¶ 11 (no Nebraska-wide restrictions on "school [or] youth . . . sports" in Phase IV, which full State entered by September 21).

Since earlier in the pandemic, daycares have also been allowed to reopen.  *See, e.g.*, Fawns Decl. ¶¶ 21–22 (Kentucky's "in-home childcare" could resume on June 8, then "center-based childcare" on June 15); Decl. of Brian Kane ¶ 5, Ex. 7 (Idaho's "private childcare and daycare facilities" could resume in Stage 1, starting on May 2).  And since July 13, a number of States have

---

[35] *Governor Hogan Continues to Stress Vigilance in COVID-19 Fight, State Superintendent Sets Guardrails for Schools to Reopen*, Office of Gov. Larry Hogan, https://governor.maryland.gov/2020/07/22/governor-hogan-continues-to-stress-vigilance-in-covid-19-fight-state-superintendent-sets-guardrails-for-schools-to-reopen/ (last visited Oct. 30, 2020).

[36] *See Daily COVID Case Map*, NYC Dep't of Educ., https://www.schools.nyc.gov/school-year-20-21/return-to-school-2020/health-and-safety/daily-covid-case-map (last visited Oct. 30, 2020) (reporting 486 "[c]onfirmed" positive cases through October 29 at 6:00 PM); *DOE Data at a Glance*, NYC Dep't of Educ., https://www.schools.nyc.gov/about-us/reports/doe-data-at-a-glance (last visited Oct. 30, 2020) ("1,126,501 students in the NYC school system, the largest school district in the United States").

removed the remaining legal restrictions on daycares.  For example, Maryland announced on October 1 that "[c]hild care providers are now able to return to the full teacher to child ratios and capacities for which they are licensed."[37]  *See also* Anthone Decl. ¶ 12 (Nebraska's remaining restrictions—capping number of children per room—were removed in Phase IV, which full State reached by September 21).  States are making sure that daycares take appropriate steps to protect returning children.  *See* Fawns Decl. ¶¶ 21–22 (Kentucky reopened its daycares "subject to social distancing, capacity, and cleaning guidelines").

Some States have poured significant resources into daycare reopening since mid-summer to sustain daycares and their ability to serve at capacity.  In Oklahoma, on July 30, "the Governor directed $9.6 million in CARES Act relief funds to 'more than 2,200 childcare centers across Oklahoma to support the industry's efforts to deliver safe, essential services during the COVID-19 pandemic.'"  Budd Decl. ¶ 14 (quoting press release that notes those funds go to providers that "have maintained active status since March 15").  In Alabama, where as little as 12% of facilities were operating in March, the Department of Human Resources launched a grant program on July 10 "to stabilize the number of childcare providers that were open and providing services and to encourage closed providers to reopen."  Decl. of Nancy T. Buckner, ¶¶ 3–4, Ex. 8.  From the program's inception through early September, Alabama disbursed more than $10 million in grant funding to 834 childcare providers, on the condition that they "either be open or have a plan to reopen no later than August 17, 2020" and commit to staying open for least a year from the disbursement date.  *Id.* ¶¶ 4, 7.  During that period, Alabama has seen a surge in the availability of daycare services from 53% open on July 7, to 63% by late July, to 76% by early September, the

---

[37] *Maryland Strong*, *supra* note 21.

most recent data available to Defendants. *Id.* ¶¶ 4, 5, 7. Maryland too recently announced grants through October 31 for the 82% of child care programs that have reopened.[38]

Women in all jurisdictions where in-person schooling has resumed and daycares are open have a much greater ability to comply with the Mifeprex in-person requirements without having to arrange childcare outside of the ordinary course. That development further undermines the factual basis of the preliminary injunction. *See* Mem. Op. at 15, 47–49, 61, 63, 76.

Strengthened public health guidance on mask wearing—and mandates in many states, including those with the largest populations[39]—further reduce the risk of COVID-19 infection for women traveling to medical facilities. Taking such precautions, state authorities have judged it safe to increase availability of common-carrier transit. On July 15, New Jersey removed seated capacity limits on a variety of public transportation and private buses.[40] The governor's executive order obligates those carriers to "[r]equire workers and customers to wear face coverings" and "[p]lace conspicuous signage . . . alerting workers and customers" regarding social distancing.[41]

---

[38] *Governor Hogan Announces Indoor Visitation Can Resume at Nursing Home Facilities, State Superintendent of Schools Expands Child Care Ratios*, Office of Gov. Larry Hogan, https://governor.maryland.gov/2020/10/01/governor-hogan-announces-indoor-visitation-can-resume-at-nursing-home-facilities-state-superintendent-of-schools-expands-child-care-ratios/ (last visited Oct. 27, 2020).

[39] *See, e.g.*, *Masks and Face Coverings*, Cal. for All, https://covid19.ca.gov/masks-and-ppe/ (Oct. 22, 2020) (requiring masks in California's public spaces); *Opening the State of Texas*, Tex. Dep't of State Health Servs., https://www.dshs.texas.gov/coronavirus/opentexas.aspx (Oct. 15, 2020) (similar general rule in Texas)

[40] *When and How Is New Jersey Lifting Restrictions? What Does a Responsible and Strategic Restart of New Jersey's Economy Look Like?*, State of New Jersey, https://covid19.nj.gov/faqs/nj-information/reopening-guidance-and-restrictions/when-and-how-is-new-jersey-lifting-restrictions-what-does-a-responsible-and-strategic-restart-of-new-jerseys-economy-look-like (Oct. 19, 2020).

[41] *Is Public Transportation Running? What Mitigation Measures Are NJ TRANSIT and Private Carriers Adopting?*, State of New Jersey, https://covid19.nj.gov/faqs/nj-information/reopening-guidance-and-restrictions/is-public-transportation-running-what-mitigation-measures-are-nj-

These precautions further reinforce that a one-time trip to a medical facility does not present heightened risk.

### D.  Greater Economic Opportunity

Finally, the Court briefly observed that COVID-19 has created "a severe economic crisis," and cited a declarant's reliance on a study purporting to show "that people of color are also more likely to have suffered wage or job loss during the pandemic."  Mem. Op. at 49.  Due to these factors, the Court wrote that "the transportation and childcare barriers are exacerbated," and that "'even paying for transportation to the clinic presents a hardship.'"  *Id.* (quoting a declaration); *see also id.* at 47 (finding lower likelihood of vehicle ownership by people of color, as well as abortion seekers' difficulties paying for private transportation).  Even assuming those findings were correct, these financial barriers have been mitigated since the preliminary injunction was entered.

In the months since July 13, a number of States have entered new phases in their reopening plans, while still maintaining public health precautions.  *See, e.g.*, Anthone Decl. ¶ 7 (full State of Nebraska entered fourth of four phases by September 21); Foster Decl. ¶ 14 (noting that although Indiana entered fifth stage on September 26, "Hoosiers are still required to wear face coverings and maintain social distancing of at least six feet.").[42]  With each phase, States have generally reopened business and community institutions to a greater extent.  For instance, beginning in early September, Maryland entered Phase III and permitted indoor dining, retail establishments, and religious facilities to further approach normal capacity,[43] and reopened indoor theaters and outdoor

---

transit-and-private-carriers-adopting (Aug. 28, 2020) (citing Executive Order 165 issued on July 13, which requires these carriers to "continue" the practices discussed).

[42]  *See also Restarting Maine's Economy*, State of Maine Office of the Governor, https://www.maine.gov/covid19/restartingmaine (Oct. 6, 2020) (Maine to enter Stage 4 on October 13).

[43]  *See Maryland Strong*, *supra* note 21 (increasing from 50% to 75% capacity).

venues at partial capacity.[44]

As the economy has reopened, employment opportunities for low-income individuals have expanded in industries such as food service and retail.  That growth is reflected in the U.S. Department of Labor's Bureau of Labor Statistics (BLS) data, which show that seasonally adjusted unemployment rates fell *each month* from May through September for white *and* African-American women who were age twenty or older—a more than 47% drop for white women and more than 32% for African-American women.[45]  Although the BLS data for white and African-American youth aged 16 to 19 years old is not disaggregated by sex, and the data for Asians is not disaggregated by sex or age, drops in unemployment occurred almost every month for those groups too.[46]  The list of States whose unemployment rates fell since April includes Maryland.[47]

In short, the further reopening of state economies since July 13 has created more economic opportunity than at the time of the preliminary injunction.  Those developments further reinforce that the Mifeprex in-person requirements are not a substantial obstacle to "those women for whom the [in-person requirements] '[are] an actual rather than an irrelevant restriction.'"  Mem. Op. at 38 (quoting *Whole Woman's Health*, 136 S. Ct. at 2320).  And although some women continue to face economic hardship as a result of the pandemic, that hardship alone does not constitute a

---

[44] *See id.* (the lower of 50% capacity or specified occupancy thresholds).

[45] Economic News Release: Table A-2. Employment Status of the Civilian Population by Race, Sex, and Age, U.S. Bureau of Labor Stats., https://www.bls.gov/news.release/empsit.t02.htm (Oct. 5, 2020) (white from 13.1% down to 6.9%; black or African American from 16.5% down to 11.1%).

[46] *Id.* (white 16–19 year-olds from 28.3% down to 15.1%; black or African American 16–19 year-olds from 34.9% down to 20.7%; Asians from 15.0% down to 8.9%).

[47] *Economy at a Glance: Maryland*, U.S. Bureau of Labor Stats., https://www.bls.gov/eag/eag.md.htm (Oct. 20, 2020) (seasonally adjusted unemployment rate fell from 10.1% in April to a preliminary figure of 7.2% in September); *see also, e.g.*, Fawns Decl. ¶ 28 (Kentucky unemployment rate down from 16.6% in April to 5.6% in September).

substantial obstacle to abortion under the undue-burden test.  *See Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 874 (1992) (joint opinion) ("The fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it."); *Harris v. McRae*, 448 U.S. 297, 316 (1980) (explaining that "although government may not place obstacles in the path of a woman's exercise of her freedom of choice, it need not remove those not of its own creation").

\*      \*      \*

As the foregoing analysis demonstrates, changes in the circumstances of this pandemic have removed or significantly mitigated the burdens on abortion access that the Court identified in its July 13 opinion.  Therefore, even assuming *arguendo* that any burdens *were once* "properly characterized as creating [] a substantial obstacle" to abortion access during the pandemic, Mem. Op. at 61, they *are no longer* a substantial obstacle.  *See id.* at 61–62; Defs.' First Stay Mot. at 9–12 (discussing purpose of the requirements and importance of deference to FDA's assessment).

Moreover, even if Plaintiffs had brought a facial challenge, any lingering burdens do not apply to "a 'large fraction' or 'significant number' of 'those women for whom the provision is an actual rather than an irrelevant restriction.'"  Mem. Op. at 62–63 (quoting *Whole Woman's Health*, 136 S. Ct. at 2320; *Casey*, 505 U.S. at 893).  The "challenges for receiving in-person medical care" and "transportation, childcare, and economic challenges" identified in the Court's Opinion are now eliminated or mitigated such that it is no longer (even if it once was) "particularly difficult and dangerous" to comply with the Mifeprex in-person requirements.  *See id.*

Accordingly, Plaintiffs are not likely to succeed on the merits of their due process claim. Defendants therefore satisfy the first factor for a stay in the unusual posture of this case.  *See supra*

21

note 4.

## II.    The Remaining *Hilton* Factors Again Favor a Stay.

As Defendants previously explained, their current inability to enforce the Mifeprex in-person requirements irreparably harms Defendants and, in turn, the public.  *See* Defs.' First Stay Mot. at 14.  Defendants are responsible for ensuring the health and safety of the public, including women seeking medication abortion with Mifeprex.  The Mifeprex in-person requirements reflect FDA's longstanding assessment of what is necessary to ensure the safe use of Mifeprex.  *See, e.g.*, Order, *FDA v. ACOG*, No. 20A34, 2020 WL 5951467, at *2 (Alito, J., dissenting) (observing that "FDA [adopted the in-person dispensing requirement] for the purpose of protecting the health of women who wish to obtain an abortion by ingesting certain medications").  An inability to enforce those requirements irreparably harms the federal government.  *Cf. Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers) (noting that anytime the government "is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury" (internal quotation marks omitted)).

The current injunction is inconsistent with that "admonition against judicial second-guessing of officials with public health responsibilities," and in effect "overrule[s] the FDA on a question of drug safety."  Order, *FDA v. ACOG*, No. 20A34, 2020 WL 5951467, at *2 (Alito, J., dissenting); *see also S. Bay United Pentecostal Church*, 140 S. Ct. at 1614 (Roberts, C.J., concurring in denial of application for injunctive relief).  Now, added to the weight of Defendants' judgment about the safety of mifepristone is the judgment of numerous States' public health officials that it is safe for many activities of normal life, including visiting medical offices, to resume.  These changed circumstances warrant staying and dissolving the preliminary injunction.

Moreover, the changed circumstances show that staying the Court's preliminary injunction would not "substantially injure" Plaintiffs, *Hilton*, 481 U.S. at 776, as States have, to a significant degree, removed the restrictions that, according to this Court, collectively created a substantial obstacle to obtaining a medication abortion during the pandemic.

For the foregoing reasons, Defendants have satisfied the *Hilton* standard for a stay, and this Court should therefore grant a stay of the preliminary injunction pending the resolution of merits proceedings in this Court.

## III. Changed Circumstances Also Warrant Staying the Nationwide Scope of the Preliminary Injunction Because Any Variation in Infection Rates and Reopening Plans Renders Nationwide Relief Improper.

Although jurisdictions may vary in their infection rates and in their assessments of when and how to reopen, any such variability further undermines the basis for a nationwide injunction. The Court held it would be "simply infeasible" to tailor a remedy "to account for both the unpredictable changes and nuanced regional differences . . . over an extended period," Mem. Op. at 77–78.  But the Fourth Circuit rejected such reasoning in August when it ruled that a "district court improperly stepped into the shoes of [a federal agency] and displaced our democratic system of governance when it insisted that a nationwide injunction was *necessary for pragmatic reasons*." *CASA de Maryland, Inc. v. Trump*, 971 F.3d 220, 262 (4th Cir. 2020) (emphasis added).[48]

At least until a vaccine is available, rates will fluctuate, as the current upward trends show. But infection rates and trendlines are not uniform nationwide, and States have shown success in managing and ultimately reducing spikes.  For example, this brief has referred to Maryland's initiatives to reopen its economy, expand its mask mandate, increase testing, boost hospital

---

[48] *See also Casa de Maryland, Inc.*, 971 F.3d at 262 ("[I]f a general interest in uniformity could sustain a nationwide injunction, then it would justify such a remedy in all cases when federal law is implicated.").

capacity, resume in-person schooling, reopen daycares, and ultimately, decrease unemployment. Other examples of States taking targeted approaches include Illinois, where on July 15, the State launched a mitigation plan to address viral resurgence regionally, on an as-needed basis, using strategies tailored to specific industries.[49]   These States and many others have weathered rising and falling COVID-19 rates, but they continue to move forward.   Variations in infection rates across geography and time demonstrate that the nationwide scope and the indefinite duration of the preliminary injunction are overbroad.

## IV.     Changed Circumstances Warrant an Indicative Ruling Dissolving the Preliminary Injunction Upon Remand.

The changed circumstances described above also warrant dissolution of the preliminary injunction, or at least the nationwide aspect of that injunction.   In evaluating those circumstances, the Court should consider whether "justice requires" relief from an interlocutory order.   *See Fayetteville Invs.*, 936 F.2d at 1473 (quoting 7 Moore's Federal Practice, ¶ 60.20, p. 60-170); *see also Thompson v. U.S. Dep't of Hous. & Urban Dev.*, 404 F.3d 821, 825 (4th Cir. 2005) ("It has long been recognized that courts are vested with the inherent power to modify injunctions they have issued."); *Movie Sys., Inc. v. MAD Minneapolis Audio Distribs., a Div. of Smoliak & Sons, Inc.*, 717 F.2d 427, 430 (8th Cir. 1983) (permitting "any changes in [a preliminary] injunction that are equitable in light of subsequent changes in the facts or the law, or for any other good reason").[50]

---

[49] *Gov. Pritzker Announces New Mitigation Plan to Prevent Resurgence of COVID-19 in Illinois as State Surpasses Two Million Tests*, Ill. Dep't of Com. & Equal Opportunity (July 15, 2020), https://www2.illinois.gov/dceo/Media/PressReleases/Pages/PR071520---1.aspx; *see also, e.g.*, Fawns Decl. ¶ 19 (noting that since "Kentucky's largest phase of 'reopening' began on June 1 . . . [g]uidance and orders for various industries and business are updated periodically to adjust restrictions").

[50] Even if the Court instead views a Rule 60(b)(5)-type standard as more appropriate, despite the non-final nature of the Court's preliminary injunction, *see, e.g.*, *Stone v. Trump*, 400 F. Supp. 3d 317, 331–32 (D. Md. 2019), and despite the Supreme Court's instruction that Defendants are authorized to file a motion to dissolve, the Court should find that its injunction against enforcement

That equitable standard is satisfied here based on the factual and legal developments set out in Part I of this brief.  The factors that the Court identified as creating a substantial obstacle to women seeking medication abortions have changed considerably.  Most States, if not all, now recognize that, with appropriate precautions, it is safe to resume various normal activities, including visiting doctor's offices.  Medical facilities are under fewer official commands or informal pressures to close or limit capacity, and are receiving guidance on accommodating women safely.  There is evidence that women are now returning to doctors' offices at rates similar to pre-pandemic levels.  Women also may take advantage of a greater range of affordable transportation and childcare options, where, in both instances, providers are taking safety precautions.

Justice requires dissolution of the preliminary injunction because the circumstances are different from earlier in the pandemic, and have changed even since July 13.  Those changed circumstances also undermine the basis for the nationwide relief that the Court preliminarily granted.  Accordingly, the Court should issue an indicative ruling that the Court would dissolve, or at least modify, the injunction if permitted to do so on remand for this purpose.

## CONCLUSION

For the reasons discussed above, Defendants respectfully request that the Court 1) stay the preliminary injunction pending the resolution of merits proceedings in District Court, or at least stay the injunction's effect insofar as it is broader than necessary to redress Plaintiff's established injuries; and 2) issue an indicative ruling that the Court is inclined to dissolve the injunction, or at least its nationwide scope, if permitted to do so on remand.

---

of the Mifeprex in-person requirements is "detrimental to the public interest" based on "a significant change either in factual conditions or in law," *Horne v. Flores*, 557 U.S. 433, 447 (2009) (internal quotation marks omitted), for the reasons discussed.

Dated:  October 30, 2020                    Respectfully submitted,


ROBERT P. CHARROW                          JEFFREY BOSSERT CLARK
General Counsel                            Acting Assistant Attorney General

STACY CLINE AMIN                           DANIEL J. FEITH
Chief Counsel                              Deputy Assistant Attorney General
Food and Drug Division
                                           GUSTAV W. EYLER
ANNAMARIE KEMPIC                           Director
Deputy Chief Counsel, Litigation
                                           HILARY K. PERKINS
SHOSHANA HUTCHINSON                        Assistant Director
 U.S. Department of
 Health and Human Services                 */s/ Jonathan E. Amgott*
 Office of the General Counsel             JONATHAN E. AMGOTT
 Food and Drug Administration              Trial Attorney
 10903 New Hampshire Avenue                Consumer Protection Branch
 Silver Spring, MD 20993                   Civil Division
                                           U.S. Department of Justice
                                           450 Fifth St., N.W., Suite 6400
                                           Washington, DC 20530